IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 25516-6-III |
| | ) | |
| Respondent, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| BEN ALAN BURKEY, | ) | UNPUBLISHED OPINION |
| | ) | |
| Appellant. | ) | |

BROWN, J. – In 2007, Ben A. Burkey appealed his convictions for first degree murder, first degree kidnapping, conspiracy to commit kidnapping, first degree robbery, and first degree assault, contending insufficient evidence supported those convictions. Before oral argument, Mr. Burkey supplemented his opening brief, adding a public trial violation based on the jury selection process. After oral argument, this court stayed Mr. Burkey's appeal to await long-delayed Supreme Court public trial decisions. The parties elected not to file supplemental briefing after these clarifying decisions. We decide the evidence amply supports each conviction, but, reverse because, considering the now well-developed case law, Mr. Burkey did not receive a public trial.

FACTS[1]

_____

[1] We draw the facts most favorably for the State consistent with our standard of review for evidence sufficiency.

On September 4, 2005, Mr. Burkey began a fight with Rick Tiwater at Mr. Burkey's home because he thought Mr. Tiwater was a rat, meaning an informant. Mr. Burkey informed him he would have his friend, James P. Tesch, come over to help determine if he was, indeed, a police informant. Mr. Burkey apparently desired Mr. Tiwater's motorcycle and discussed having it signed over to him, but dropped the plan when he discovered the motorcycle's serial number was scratched out. This further heightened Mr. Burkey's suspicions about Mr. Tiwater. Mr. Burkey sent his girlfriend, Patricia A. Lascelles, to get Mr. Tesch.

According to Ms. Lascelles, Mr. Tesch arrived at Mr. Burkey's later that night and confronted Mr. Tiwater. He kicked Mr. Tiwater, dragged him into the kitchen, and then hit him on the head with a hammer. Mr. Burkey then drove Mr. Tiwater's motorcycle to a friend's house and parked it. When he returned, Mr. Tesch carried an unconscious Mr. Tiwater to a friend's Ford Thunderbird and placed him in the backseat. Mr. Burkey and Mr. Tesch drove away with Mr. Tiwater.

At daylight, Mr. Burkey and Mr. Tesch returned to Ms. Lascelles' home without Mr. Tiwater. Mr. Burkey had blood on his coat and boots. Mr. Tesch was carrying Mr. Tiwater's clothes and a bloody golf club. Mr. Tesch and Mr. Burkey told Ms. Lascelles to wash the golf club and burn the clothes. Mr. Tesch told Ms. Lascelles to wash the car. When the clothes would not fully burn, she threw them in the river. Mr. Burkey drove Mr. Tiwater's motorcycle to Mr. Tesch's home where it was first stored and then moved to a different location. Mr. Burkey later told a friend he had gone "golfing" the

2

night before and Mr. Tiwater probably fell into a campfire and would not be returning. Report of Proceedings (RP) at 500.

Mr. Tiwater's body was soon discovered near a dirt road in a remote area North of Spokane. He had been beaten, run over by a car, and his hair burned to the scalp. A broken mud flap and tire tracks found at the scene were matched to the Ford Thunderbird. Mr. Tiwater's hair and blood were found on the vehicle's undercarriage. A boot impression found at the scene matched one of Mr. Burkey's boots. Mr. Burkey's fingerprints were recovered from the Ford Thunderbird.

The State charged Mr. Burkey as an actor and/or accomplice, with first degree murder, first degree kidnapping, conspiracy to commit first degree kidnapping, first degree robbery, conspiracy to commit first degree robbery, and first degree assault.

Mr. Burkey waived his right to be present when the jury pool was sworn in by the court in the main jury room in the presence of the attorneys. The prospective jurors were given a questionnaire. While the jurors completed their questionnaires, the other parties returned to the courtroom for a CrR 3.5 hearing. Following the CrR 3.5 hearing, the court announced a recess and then asked counsel if they had the "jury bios" and questionnaire answers. The prosecutor informed the court that they did and then the court recessed. Upon reconvening, individual voir dire was conducted in a separate room. The record does not indicate who requested the separate questioning. The sole explanation for the separate questioning was the court's instruction to the potential jurors that "experience has shown that sometimes there's certain questions best

3

answered in the privacy of a private room like this." RP (June 12, 2006) at 82. Present for the questioning was the trial judge, the prosecutor, Mr. Burkey, defense counsel, and a defense investigator. Thirteen jurors were questioned and five were excused for cause during the process.

The next morning, the court convened in the presence of "the parties and Counsel" to interview juror 48, who was then excused. RP (June 13, 2006 ) at 159. The judge commented about needing all the jurors together before coming back in for voir dire so "we don't have the defendant coming in while the jurors are coming into the room." RP (June 13, 2006) at 166. The record shows the jurors coming into open court and being introduced to Mr. Burkey. The record is silent about when Mr. Burkey entered the courtroom. Mr. Burkey did not object to the jury selection proceedings.

At the end of the State's case-in-chief, Mr. Burkey unsuccessfully challenged the sufficiency of the State's evidence. Mr. Burkey then testified Mr. Tesch was solely responsible and he went along because he feared for his and his family's safety.

The jury found Mr. Burkey guilty as charged and found all the crimes were committed while he was armed with a deadly weapon. Mr. Burkey unsuccessfully requested arrest of judgment or a new trial based on insufficient evidence to support the jury's findings. Before sentencing, the court dismissed the conspiracy to commit first degree robbery conviction. Mr. Burkey appealed.

4

## ANALYSIS

### A. Evidence Sufficiency

The issue is whether sufficient evidence supports Mr. Burkey's five convictions. He contends sufficient evidence does not show he acted as a principal, or an accomplice, to first degree kidnapping, conspiracy to commit first degree kidnapping, first degree robbery, first degree murder, or first degree assault. He argues the evidence merely shows he was an innocent bystander. We disagree.

Evidence is sufficient to support a conviction if, viewed in the light most favorable to the State, it allows any rational trier of fact to find the essential elements of the crime beyond a reasonable doubt. *State v. Smith*, 155 Wn.2d 496, 501, 120 P.3d 559 (2005). An insufficient evidence claim admits the truth of the State's evidence. *Id.*

1. First Degree Kidnapping. To convict Mr. Burkey of first degree kidnapping, the jury had to find beyond a reasonable doubt that he intentionally abducted Mr. Tiwater with the intent "[t]o facilitate commission of any felony or flight thereafter" or "[t]o inflict bodily injury on him." RCW 9A.40.020(1)(b), (c). "'Abduct' means to restrain a person by either (a) secreting or holding him or her in a place where he or she is not likely to be found, or (b) using or threatening to use deadly force." RCW 9A.40.010(1). The testimony showed Mr. Tesch and Mr. Burkey placed an unconscious Mr. Tiwater in the back of a car and drove him to a remote area. These actions constitute abduction. Next, Mr. Tiwater was beaten, burned and ran over by a car, resulting in his death. The abduction facilitated the commission of a felony. While Mr. Burkey argues another

version of the events, we defer to the trier of fact in matters of witness credibility and evidence weight. *State v. Thomas*, 150 Wn.2d 821, 874-75, 83 P.3d 970 (2004).

2. Conspiracy to Commit Kidnapping. "A person is guilty of criminal conspiracy when, with intent that conduct constituting a crime be performed, he or she agrees with one or more persons to engage in or cause the performance of such conduct, and any one of them takes a substantial step in pursuance of such agreement." RCW 9A.28.040(1). Mr. Burkey summoned Mr. Tesch to his house to deal with Mr. Tiwater, who they believed was an informant. They discussed Mr. Tiwater's motorcycle and devised a plan to move it. They worked together to place Mr. Tiwater in the back seat of the Ford Thunderbird and took him to the outskirts of town. Viewing this evidence in a light most favorable to the State, Mr. Burkey and Mr. Tesch agreed to kidnap Mr. Tiwater together and at least one of them took a substantial step in furtherance of the crime. Thus, sufficient evidence supports the conspiracy to commit kidnapping.

3. First Degree Robbery. A person commits robbery if he or she unlawfully takes personal property from another against that person's will and uses force to retain possession of the property or to prevent or overcome resistance to the taking. RCW 9A.56.190. A person commits first degree robbery if, in the commission of a robbery or in immediate flight therefrom, he or she inflicts bodily injury. RCW 9A.56.200(1)(a)(iii). Viewing the evidence in a light most favorable to the State, Mr. Tiwater's motorcycle was taken against his will and by force. Mr. Burkey had expressed an interest in Mr. Tiwater's motorcycle. After Mr. Tiwater was unconscious, Mr. Burkey took the

6

motorcycle to another residence. Expert and lay testimony support that Mr. Tiwater was severely beaten prior to the motorcycle being moved to another residence. Because bodily injury was inflicted, the robbery was elevated to first degree. Thus, sufficient evidence supports Mr. Tesch's first degree robbery conviction.

4. First Degree Murder. Relevant here, a person is guilty of first degree murder when: "He or she commits or attempts to commit the crime of either (1) robbery in the first or second degree . . . or (5) kidnapping in the first or second degree, and in the course of or in furtherance of such crime or in immediate flight therefrom, he or she, or another participant, causes the death of a person other than one of the participants." RCW 9A.32.030(1)(c). As reasoned, sufficient evidence shows Mr. Burkey participated in the kidnapping and robbery of Mr. Tiwater. Because Mr. Tiwater's death occurred in the course of these crimes, sufficient evidence supports the first degree murder conviction.

5. First Degree Assault. "A person is guilty of assault in the first degree if he or she, with intent to inflict great bodily harm: (a) Assaults another with a firearm or any deadly weapon or by any force or means likely to produce great bodily harm or death." RCW 9A.36.011(1)(a). "[C]ircumstantial evidence as well as direct evidence carries equal weight." *State v. Varga*, 151 Wn.2d 179, 201, 86 P.3d 139 (2004) (citing *State v. Delmarter*, 94 Wn.2d 634, 638, 618 P.2d 99 (1980)). Direct and circumstantial evidence show Mr. Burkey assaulted Mr. Tiwater in the first degree. Mr. Burkey initiated a fight with Mr. Tiwater, who he later helped kidnap. The blood evidence found on Mr.

7

Burkey's coat and boots show presence, and the bloody golf club, and car indicate the means of force used. While Mr. Burkey argues he was an innocent bystander, we leave evidence weight and witness credibility questions to the jury. *State v. Maxfield*, 125 Wn.2d 378, 385, 886 P.2d 123 (1994). Thus, evidence showed Mr. Burkey, with intent to inflict great bodily harm, assaulted Mr. Tiwater by force likely to produce great bodily harm or death.

## B. Public Trial

The issue is whether Mr. Burkey's constitutional right to a public trial was violated under a record showing the court conducted voir dire in a separate room from the main courtroom and Mr. Burkey was not present at all times during jury selection, particularly when the court questioned juror 48, and when the jury bios were reviewed.

1. Public Trial. Mr. Burkey contends the trial court's questioning of individual jurors in a separate room violated his public trial rights. We first decide whether the trial court's private questioning constituted a closure. A criminal defendant has a right to a public trial as guaranteed by our state and federal constitutions. U.S. CONST. amend. VI; WASH. CONST. art. I, § 22. Defendants can raise claims of public trial rights violations for the first time on appeal. *State v. Wise*, 176 Wn.2d 1, 9, 288 P.3d 1113 (2012).

The public trial right in voir dire proceedings extends to the questioning of individual prospective jurors. *Id.* at 16-19. The right to a public trial is not absolute, however, a trial court may close the courtroom so long as it considers the five criteria

outlined in *State v. Bone-Club*, 128 Wn.2d 254, 258-59, 906 P.2d 325 (1995). Failure to conduct a *Bone-Club* analysis before closing the proceeding is error generally requiring a new trial because voir dire is an inseparable part of trial. *State v. Paumier*, 176 Wn.2d 29, 35, 288 P.3d 1126 (2012).

In *State v. Strode*, 167 Wn.2d 1, 288 P.3d 1113 (2009), jury members were brought into the judge's chambers for questioning regarding sensitive topics, with the trial judge, prosecuting attorney, defense counsel, and the defendant present. *Id.* at 224. The purpose was to protect the jurors' privacy interests. Our Supreme Court decided this amounted to a closure and, because the court did not first conduct a *Bone-Club* analysis, the defendant's right to a public trial was violated. *Id.* at 231. In *Wise* and *Paumier*, the court reached similar holdings. *Wise*, 176 Wn.2d at 15; *Paumier*, 176 Wn.2d at 37.

Our record shows portions of voir dire were conducted in a private room with defense counsel, Mr. Burkey, a defense investigator, the prosecutor, and the judge present. The sole explanation of why the separate questioning was the court's instruction to the potential jurors that, "[E]xperience has shown that sometimes there's certain questions best answered in the privacy of a private room like this." RP (June 12, 2006) at 82. No *Bone-Club* analysis was attempted.

Based on *Strode* and other later case law, the trial court erroneously closed the courtroom when it privately questioned potential jurors without first conducting a *Bone-Club* analysis. The trial court did not explicitly or implicitly consider the familiar *Bone-*

9

*Club* factors or acknowledge that it was closing the courtroom. The court's bare explanation was legally insufficient. Because the facts here are similar to *Strode*, we hold Mr. Burkey's public trial rights were violated when jurors were questioned in a private room without the court first conducting a *Bone-Club* analysis. If a trial court does not weigh the *Bone-Club* factors on the record before closing trial proceedings to the public, we must follow precedent and reverse and remand for a new trial because the error is structural, presumptively prejudicial, and never harmless. *Wise*, 176 Wn.2d at 14-19; *Paumier*, 176 Wn.2d at 35-37.

2. Right to be present. Mr. Burkey next contends he was denied his right to be present at all critical stages of his trial because he was not present for the review of the jury bios and during questioning of potential juror 48. Under the Sixth and Fourteenth Amendments to the United States Constitution, a criminal defendant has a fundamental right to be present at all "critical stages" of trial. *State v. Irby*, 170 Wn.2d 874, 880, 246 P.3d 796 (2011). Our Supreme Court has recognized that jury selection is a critical stage of trial to which the right to be present attaches. *Id.* at 883-84.

This contention is raised for the first time on appeal. RAP 2.5(a) precludes considering issues for the first time on appeal. RAP 2.5(a)(3), however, allows for manifest errors affecting a constitutional right. The first test used for deciding the applicability of RAP 2.5(a)(3) is "whether the alleged error is truly constitutional." *State v. Kronich*, 160 Wn.2d 893, 899, 161 P.3d 982 (2007) (citation omitted).

No. 25516-6-III
*State v. Burkey*

However, in view of our dispositive holding that Mr. Burkey's convictions must be reversed based on the violation of his public trial rights, we do not address further his arguments concerning his right to be present. Moreover, the record is unclear about the extent of Mr. Burkey's presence or absence. Rather than remand to reconstruct the record and extend this already lengthy appeal, we do not reach this contention.

Reversed.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

Brown, J.

WE CONCUR:

Siddoway, C.J.

Lawrence-Berrey, J.

11