IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| STATE OF WASHINGTON,<br><br>　　　　　　　　Respondent,<br><br>　　　v.<br><br>RICARDO CORTEZ KINER, JR.,<br><br>　　　　　　　　Appellant. | No. 83593-9-I<br><br>DIVISION ONE<br><br>UNPUBLISHED OPINION |

　　　DÍAZ, J. — Ricardo Cortez Kiner was arrested after he assaulted his girlfriend, A.W., in their home. While in jail, Kiner made repeated phone calls to A.W., violently threatening her and ordering her to do everything within her power to get him out of jail, even after the court issued a no contact order protecting her. Kiner appeals his convictions for assault, witness tampering, and felony violation of a no contact order, arguing that the trial court violated his right to a unanimous jury verdict as to the latter two. Kiner further contends the court erroneously admitted A.W.'s hearsay statements under the doctrine of forfeiture by wrongdoing, erroneously gave the jury a supplemental jury instruction, and violated several of his rights by conducting remote jury selection. We affirm.

I.     FACTS

On March 10, 2020, A.W. called 911 to report that Kiner, her boyfriend of approximately two years, had just assaulted her in their home. A.W. told police that, after a minor argument, Kiner hit her and grabbed her by the throat and squeezed, even as she tried to hide in the bathroom. A.W. reported that, during the assault, Kiner was threatening her and telling her she had to be quiet so that police would not show up.

After the assault, A.W. ran outside and called the police, at which time Kiner got in A.W.'s car and drove away. While on the phone with the 911 operator, A.W. reported that Kiner was "circling the block" in his car and calling her. A.W. described Kiner in detail — including his age, race, build, full name, and birthdate — and reported that she was afraid to return to her apartment because Kiner had a key.

When police arrived, they found A.W. crying, with a swollen face and a bleeding lip. A.W. insisted on talking to police inside her apartment because she was afraid Kiner would see them. When police asked for Kiner's contact information, A.W. refused to provide it and told police "I'm just scared. I'm scared. I called the police for my family. I'm scared of him." While A.W. was talking to police, Kiner texted her "so we bac to police shit? U better not f[—]in snitch on me" and "I see that police out there I swear you bet not snitch on me b[—]."

The State charged Kiner with assault in the second degree-strangulation, with a domestic violence designation. Kiner was arrested on April 8, 2020 and booked into King County Jail, where he stayed until April 14, 2020. While in jail for

those six days, Kiner called A.W. approximately 54 times.  In these calls, as will be reviewed in more detail below, Kiner berated and demeaned A.W.  Kiner further demanded that A.W. recant and warned her, if she did not, that "I will f[—]ing take your life, b[—]."

In response, A.W. told Kiner "[t]he only thing we're working on is getting you out" and "I know exactly what to do."  A.W. told Kiner she contacted the prosecuting attorney in an attempt to get the case dismissed.  And she repeatedly assured him that she would follow his instructions and do what he asked.

After Detective Kathryn Fitzgerald listened to these calls, she made a referral for new charges.  On May 1, 2020, the State charged Kiner with witness tampering for the calls he made between April 8 and April 14.  Kiner was re-arrested on May 5, 2020.

On May 12, 2020, the trial court issued a pretrial no contact order protecting A.W.  This order prohibited Kiner from contacting A.W. directly or indirectly, or contacting her through third parties.  Despite this order, Kiner continued calling A.W.  While these calls were made to a different number than the calls made in April, Detective Fitzgerald testified A.W. was the recipients of these calls.  Based on these additional calls, the State charged Kiner with three felony violations of a no contact order.

Prior to trial, A.W. stopped responding to the State's efforts to contact her.  Despite repeated attempts, the police and the prosecutor were unable to locate A.W.  Eventually the victim advocate was able to find A.W. on social media under

a false name, but A.W. reported that she had left the state and would not come to trial.

Because the State believed that A.W. would not appear or testify at trial, it sought to have the court determine that A.W.'s recorded interview with responding police officer Jason Pitts was admissible under the doctrine of forfeiture by wrongdoing. The trial court granted the State's motion and admitted A.W.'s statements to police.

On April 30, 2021, the jury found Kiner guilty of assault in the fourth degree, witness tampering, and three counts of violating a no contact order. The jury further found that these were domestic violence offenses.

Kiner filed a post-trial motion for a new trial alleging instructional error and asserting insufficient evidence regarding witness tampering. The State opposed the motion. The trial court denied the post-trial motion and sentenced Kiner to 60 months incarceration.

Kiner appeals.

## II.     ANALYSIS

### A.     Jury Unanimity

Criminal defendants have the constitutional right to a unanimous jury verdict. Richardson v. United States, 526 U.S. 813, 817, 119 S. Ct. 1707, 143 L. Ed. 2d 985 (1999); State v. Petrich, 101 Wn.2d 566, 569, 683 P.2d 173 (1984), overruled in part on other grounds by State v. Kitchen, 110 Wn.2d 403, 406 n.1, 756 P.2d 105 (1988), abrogated in part on other grounds by In re Pers. Restraint of Stockwell, 179 Wn.2d 588, 316 P.3d 1007 (2014). "Whether or not a unanimity

4

instruction was required in a particular case is a question of law reviewed de novo." State v. Lee, 12 Wn. App. 2d 378, 393, 460 P.3d 701 (2020) (citing State v. Boyd, 137 Wn. App. 910, 922, 155 P.3d 188 (2007)).

Kiner challenges his convictions for witness tampering and violation of a no contact order, arguing that he was denied his right to a unanimous jury verdict because the court did not instruct the jury to be unanimous as to, and the prosecutor failed to elect, either (1) a specific act to support each conviction or (2) which alternative means of committing witness tampering applied. We will address each in turn.

1. Specific Act and Continuous Course of Conduct

Kiner first argues that his right to unanimity was violated when the State presented evidence of multiple acts to support each charge, but the trial court did not instruct the jury to be unanimous as to which of the acts supported each conviction and the State did not elect a specific act for each. The State argues that no unanimity instruction was required here where the acts constituted a continuing course of conduct for each charge. We agree with the State.

When evidence of multiple acts is presented, any one of which could constitute the charged crime, the trial court must ensure the jury is unanimous as to which of the acts supports the conviction. State v. Handran, 113 Wn.2d 11, 17, 775 P.2d 453 (1989); Petrich, 101 Wn.2d at 572. Either the State must elect the act on which it relies or the court must instruct the jury to agree unanimously as to what act or acts the State proved beyond a reasonable doubt. Kitchen, 110 Wn.2d at 411. "The error stems from the possibility that some jurors may have relied on

one act or incident and some another, resulting in a lack of unanimity on all of the elements necessary for a valid conviction." Id.

A unanimity instruction or election is not required, however, where the State presents evidence of multiple acts that constitute a "continuing course of conduct." Handran, 113 Wn.2d at 17 (quoting Petrich, 101 Wn.2d at 571). A continuing course of conduct is "an ongoing enterprise with a single objective." State v. Love, 80 Wn. App. 357, 361, 908 P.2d 395 (1996). To determine whether a continuing course of conduct exists, a court will "evaluate the facts in a commonsense manner considering (1) the time separating the criminal acts and (2) whether the criminal acts involved the same parties, location, and ultimate purpose." State v. Brown, 159 Wn. App. 1, 14, 248 P.3d 518 (2010) (citing Love, 80 Wn. App. at 361). When several criminal acts occur over the course of several days and involve the same parties, location, and ultimate purposes, the acts may be considered the same criminal conduct. Brown, 159 Wn. App. at 7, 13-15. We consider each charge in turn.

    a.    Witness Tampering

Kiner argues that the court should have instructed the jury to be unanimous as to (or the State elected) which of the presented jail calls affirmatively supported the witness tampering conviction.[1] Here, the State charged Kiner with one count

---

[1] In his reply for the first time, Kiner asserts that the State was additionally required to *specifically disclaim* its reliance on the existence of the 40 calls *not* provided to the jury as evidence of witness tampering. (Citing State v. Carson, 184 Wn.2d 207, 228, 357 P.3d 1064 (2015)). But "[a]n issue raised and argued for the first time in a reply brief is too late to warrant consideration." Cowiche Canyon Conservancy v. Bosley, 118 Wn.2d 801, 809, 828 P.2d 549 (1992).

of witness tampering under RCW 9A.72.120, which it alleged occurred between April 8, 2020 and April 14, 2020. At trial, the State presented evidence that, during this time frame, Kiner made 54 calls to A.W., 14 of which the State provided to the jury and used to support the charge of witness tampering.

In those 14 calls, Kiner repeatedly berated and demeaned A.W., calling her a variety of names, saying he hated her, and telling her that it was her fault that he was in jail. Kiner was verbally abusive to A.W., telling her "I don't give a f[—] about what I did to you, b[—]."

Kiner demanded that A.W. show up at his arraignment and his court dates and told her to "f[—]ing get me out of jail." He ordered her "you better tell them it wasn't me" and instructed her to "get this thing dismissed or get my bail lowered down to get out." He told her to get him out of jail because "You don't have a f[—]ing choice."

And he made it clear that A.W.'s failure to get him out of jail would result in serious physical consequences. Kiner threatened "[t]his is your health. (Inaudible). Get me the f[—] out of jail, b[—]." "If I'm in here [until May], b[—], you're done. So don't — so you better do everything in your motherf[—]ing power, dude, to get me the f[—] out of here." "The longer I'm in here, the madder I'm getting." "I will f[—]ing take your life, b[—]."

We hold that these calls are all part of a continuous course of conduct supporting the charge of witness tampering. These calls involved the same parties, Kiner and A.W. And, despite Kiner's assertion to the contrary, a commonsense review of the calls reveals that they involved the same ultimate

7

purposes: Kiner called A.W. to menace her, control her behavior, and threaten her with the obvious goals of inducing her to testify falsely or not testify at all, thereby relieving him from accountability for his actions.

Kiner contends that the calls happened over too long a period of time to constitute a continuing course of conduct. We disagree. Although the calls did not occur at the same time, the time separating them was relatively short; the calls occurred over a total of seven days. And the 14 calls provided to the jury were made relatively close in time to the others, never separated by more than two days. Washington courts have concluded that acts that occur over even longer periods of time can constitute a continuing course of conduct. See State v. Craven, 69 Wn. App. 581, 588, 849 P.2d 681 (1993) (concluding there was a continuing course of conduct where the defendant inflicted numerous injuries on child over the course of three weeks); State v. Gooden, 51 Wn. App. 615, 620, 754 P.2d 1000 (1988) (affirming a continuing course of conduct where the defendant committed acts promoting the prostitution of two girls over a 10-day period in which the defendant was in constant association with the girls); State v. Barrington, 52 Wn. App. 478, 479, 482, 761 P.2d 632 (1988) (affirming a continuing course of conduct where the defendant engaged in acts of promoting prostitution "virtually every day" for a three-month period).

Kiner next argues that the language of RCW 9A.72.120(3) precludes the State from charging witness tampering as a continuing course of conduct crime. We again disagree.

RCW 9A.72.120(3) states that "each instance of an attempt to tamper with a witness constitutes a separate offense."[2]  But Kiner cites no authority for the proposition that this language *requires* the State charge each instance separately, or that separate instances of tampering may not be aggregated into a continuing course of conduct.  Instead, this court has concluded that, even where a statute permits convictions for each distinct act, it does not necessarily preclude the State from charging it as a continuing course of conduct.  See Gooden, 51 Wn. App. at 618 (noting that "[a]lthough the statute regarding promoting prostitution in the first degree permits convictions for each distinct act, it also contemplates a continuing course of conduct: instituting, aiding, or facilitating a prostitution enterprise" and concluding the conduct at issue was a continuing course of conduct).

More generally, this court has "considered various factors in determining whether a continuing course of conduct exists in a particular case." State v. Fiallo-Lopez, 78 Wn. App. 717, 724, 899 P.2d 1294 (1995).  And, "the fact that a crime *can* be charged as a continuing course of conduct is also *a* relevant factor in the analysis." Id. at 725 (emphasis added).  The reverse is certainly true: the fact that the State could have charged each, or some greater subset, of the dozens of calls

---

[2] In response to State v. Hall, 168 Wn.2d 726, 729, 230 P.3d 1048 (2010), which determined that witness tampering was a continuing course of conduct crime *for the purposes of double jeopardy,* the legislature amended RCW 9A.72.120.  See LAWS OF 2011, ch. 165, § 1.  This change to the law was merely "intend[ed] to clarify that each instance of an attempt to intimidate or tamper with a witness constitutes a separate violation for purposes of determining the unit of prosecution" under the relevant statutes.  Id.  Thus, the amendment simply clarifies that a defendant does not face double jeopardy when charged with multiple counts of witness tampering.  But there is no such double jeopardy risk alleged here.  If anything, Hall demonstrates that our Supreme Court would view Kiner's acts, like Hall's, as a continuing course of conduct.

as discrete instances of witness tampering is a factor, but not a dispositive factor, as Kiner urges here.

Ultimately, because the calls were made relatively close in time and involve the same parties and ultimate purposes, we hold that those actions represented a continuing course of conduct, and no unanimity instruction or election was required.

    b.    <u>Violation of a No Contact Order</u>

Kiner similarly argues that a unanimity instruction or election was required for each of the charges for violation of a no contact order.

The State charged Kiner with three counts of violating a court order protecting A.W. These counts cover three charging periods: May 12 to May 26, May 27, and May 28 to May 29. The State supported these charges with telephone data from the jail claiming to show that Kiner made a number of calls from his own inmate booking number and from other jail inmates' booking numbers to a phone number associated with A.W. The State provided six of these calls to the jury, four from the first charging period and one from each of the other charging periods, and asked the jury to find that the parties involved were Kiner and A.W. The State, in turn, again argues here that these calls present a continuing course of conduct.

<u>Brown</u> provides helpful guidance to courts as to how to analyze whether phone calls form a continuing course of conduct for violations of a no contact order. In that case, the defendant was convicted of multiple counts of violation of a no-contact order for making separate contacts with the protected party over several days. <u>Brown</u>, 159 Wn. App. at 13. For six of the counts, the evidence

demonstrated that the defendant had made multiple calls to the protected party, sometimes over the course of multiple days. Id. at 6-7. On appeal, this court held that the defendant's multiple acts forming the basis for violation of a no contact court order constituted a single continuing course of conduct where the time separating the acts was short, the acts involved the same parties, the acts took place at same location, and the defendant committed the acts for the same ultimate purpose (to contact and confront the protected party of the no contact court order). Id. at 15.

This case is analogous. Viewing the facts in a "commonsense manner," Kiner made numerous calls to A.W. over three relatively short periods of time, which he did for the same ultimate purpose — to contact A.W., who was protected by the no contact order. Fiallo-Lopez, 78 Wn. App. at 724. Thus, Kiner's multiple calls to A.W. constituted a continuing course of conduct for which no unanimity instruction or election was required.

2. Alternative Means

The right to a unanimous jury verdict "may also include the right to a unanimous jury determination as to the means by which the defendant committed the crime when the defendant is charged with (and the jury is instructed on) an alternative means crime." State v. Owens, 180 Wn.2d 90, 95, 323 P.3d 1030 (2014). To evaluate whether unanimity as to means is required, courts examine whether sufficient evidence exists to support each of the alternative means submitted to the jury. State v. Ortega-Martinez, 124 Wn.2d 702, 707, 881 P.2d 231 (1994). When sufficient evidence supports each of the alternative means of

committing the crime, express jury unanimity as to which means is not required. Owens, 180 Wn.2d at 95. Insufficient evidence on any one means necessitates a particularized expression of jury unanimity, or the conviction is invalid. Id.

Witness tampering is an alternative means crime. State v. Lucas-Vicente, 22 Wn. App. 2d 212, 220, 510 P.3d 1006 (2022). Under RCW 9A.72.120(1), a person is guilty of witness tampering if they induce a witness in an official proceeding to:

> (a) Testify falsely or, without right or privilege to do so, to withhold any testimony; or
> (b) Absent himself or herself from such proceedings; or
> (c) Withhold from a law enforcement agency information which he or she has relevant to a criminal investigation or the abuse or neglect of a minor child to the agency.

Here, the State argued Kiner committed the offense under RCW 9A.72.120(1)(a) and (b). Kiner does not challenge that there was sufficient evidence presented that Kiner induced A.W. to testify falsely. Instead, Kiner only argues that the State failed to present evidence that Kiner induced A.W. to absent herself from the trial.

"Evidence is sufficient to support a conviction if, after viewing the evidence in the light most favorable to the State, it allows any rational trier of fact to find all of the elements of the crime charged beyond a reasonable doubt." State v. DeVries, 149 Wn.2d 842, 849, 72 P.3d 748 (2003). A challenge to the sufficiency of the evidence admits the truth of the State's evidence and all reasonable inferences therefrom. Id.

Kiner seems to argue that the fact that he told A.W. on several instances that she should come to court and recant somehow precludes the inference that

he also induced her not to appear. That is a false dichotomy and contrary to making all reasonable inferences in favor of the jury's conviction.

Further, Kiner sweepingly told A.W. "you better do everything in your motherf[—]ing power, dude, to get me the f[—] out of here." That order was in the context of repeatedly threatening her and warning her that "[t]he longer I'm in here, the madder I'm getting." When A.W. assured Kiner that "I'm just trying to get you out of there," he responded "First of all, you wouldn't be having to try to get me out of here, if you (inaudible) . . . Let's not go there, bro, because (inaudible) I will f[—]ing take your life, b[—]."

In the light most favorable to the State's evidence, a rational jury could reasonably infer from these broad and starkly menacing messages that Kiner intended to induce A.W. to absent herself if her lies did not succeed. In other words, a rational jury could infer from his statement that she "do everything in [her] motherf[—]ing power, dude, to get me the f[—] out of here," that he meant she not appear for trial if necessary. And Kiner's efforts were ultimately successful; A.W. refused to testify or, at least, did not appear for trial, having purportedly left the state.

Because sufficient evidence supports either alternative means, there was no error in failing to provide a unanimity instruction or election regarding the alternative means of witness tampering.[3]

_____

[3] Kiner separately argues that generally there is insufficient evidence to support his witness tampering and no contact order violation convictions because, he contends, there is insufficient evidence that Kiner contacted A.W. or intended to keep her from appearing at trial. We disagree. Due process requires that the State prove each element of a charged offense beyond a reasonable doubt. State v.

13

**B.**     **Forfeiture by Wrongdoing**

Next, Kiner argues that the trial court violated his rights under the confrontation clause by admitting A.W.'s hearsay statements under the forfeiture by wrongdoing doctrine.   Because the trial court's findings are substantially supported by evidence in the record, we reject Kiner's contention.

The Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. CONST. amend. VI.  This ordinarily means that if the State wishes to present a witness's prior testimonial statements at trial, the witness must be truly unavailable and the defendant must have had a prior opportunity for cross-examination.  Crawford v. Washington, 541 U.S. 36, 59, 68, 124 S. Ct. 1354, 158 L. Ed. 2d 177 (2004).

But the confrontation right is subject to the doctrine of forfeiture by wrongdoing, as recognized by our Supreme Court in State v. Mason, 160 Wn.2d 910, 926, 162 P.3d 396 (2007) and clarified by the United States Supreme Court in Giles v. California, 554 U.S. 353, 128 S. Ct. 2678, 171 L. Ed. 2d 488 (2008).

---

Chacon, 192 Wn.2d 545, 549, 431 P.3d 477 (2018).  Evidence is sufficient to support a conviction if, viewed in the light most favorable to the State, any rational trier of fact could have found the elements of the crime beyond a reasonable doubt. State v. Elmi, 166 Wn.2d 209, 214, 207 P.3d 439 (2009).  As discussed, there is ample evidence demonstrating that Kiner induced A.W. to testify falsely and absent herself from trial.  Further, there is sufficient evidence that Kiner contacted A.W. in violation of the no contact order.  Viewing the evidence in the light most favorable to the State, it is clear that Kiner made the calls to A.W.  Detective Fitzgerald testified that many of the calls originated from Kiner's booking number, which requires his PIN number and voice biometrics; that the parties to the calls referred to each other by name; and that she recognized both of their voices.  Several of the calls further identify the caller as "Ricardo Kiner."

14

Under the forfeiture by wrongdoing doctrine, "a defendant forfeits the Sixth Amendment right to confront a witness when clear, cogent, and convincing evidence shows that the witness has been made unavailable by the wrongdoing of the defendant, and that the defendant engaged in the wrongful conduct with the intention to prevent the witness from testifying." State v. Dobbs, 180 Wn.2d 1, 11, 320 P.3d 705 (2014).

Furthermore, a witness is unavailable only if the prosecution "made a good-faith effort to obtain [the witness's] presence at trial." State v. Hacheney, 160 Wn.2d 503, 521, 158 P.3d 1152 (2007) (quoting Barber v. Page, 390 U.S. 719, 724-25, 88 S. Ct. 1318, 20 L. Ed. 2d 255 (1968)). "The length to which the prosecution must go to procure a witness's presence is a question of reasonableness." Id. A "good-faith effort" requires a conclusion of "due diligence." State v. Rivera, 51 Wn. App. 556, 559-60, 754 P.2d 701 (1988) (quoting Fresneda v. State, 483 P.2d 1011, 1017 (Alaska 1971)).

Under the clear, cogent, and convincing evidence standard of proof, the fact of unavailability must be shown to the trial court to be "'highly probable'" but need not be beyond a reasonable doubt. Dobbs, 180 Wn.2d 1 at 11, 16 (quoting In re Welfare of Sego, 82 Wn.2d 736, 739, 513 P.2d 831 (1973)). "Because the trial court is in the best position to evaluate witness unavailability, we do not easily overturn a trial court's factual unavailability determination." Hacheney, 160 Wn.2d at 522. A challenge to hearsay testimony admitted under the forfeiture by wrongdoing doctrine is a Sixth Amendment confrontation issue that we review de novo. Dobbs, 180 Wn.2d at 10.

In support of his argument that the trial court violated his right to confront his accuser, Kiner challenges two of the trial court's findings. First, he argues the State did not present clear and convincing evidence that Kiner intended to prevent A.W. from testifying. We disagree.

Prior to trial, the State submitted the certification of probable cause for the witness tampering charges, in which Detective Fitzgerald explained, for further context, that, in 2020 alone, A.W. or a person on A.W.'s behalf placed nine 911 calls reporting Kiner for domestic violence. And, again without repeating the many details above, Detective Fitzgerald described many of the calls Kiner made to A.W. between April 8, 2020 and April 12, 2020, in which Kiner repeatedly blamed, threatened, and manipulated A.W. Importantly, A.W. responded that she would comply. This testimony presented clear, cogent, and convincing evidence that A.W. was made unavailable because of the control Kiner held over A.W., which he used to intimidate her into doing "everything in [her] [ ] power" to get him out of custody, including ceasing to cooperate with the State and then not appearing at all. When the victim advocate finally reestablished contact with A.W., A.W. said she did not want anything to do with the trial and would not appear. Kiner's wrongful violent threats caused A.W. to acquiesce out of fear or compliance.

Kiner next argues the State did not demonstrate that it made a good-faith effort to obtain her presence at trial. Much of Kiner's argument revolves around the fact that the State did not attempt to serve the subpoena, either before she absconded or after. While we have some concerns about whether the State can be said to have made a good faith effort to obtain A.W.'s presence at trial without

16

attempting to serve her, we need not decide that issue because any error in admitting A.W.'s recorded interview was harmless.

We conduct constitutional harmless error analysis for confrontation clause errors. State v. Jasper, 174 Wn.2d 96, 117, 271 P.3d 876 (2012). Under this standard, the State must show beyond a reasonable doubt that the error did not contribute to the verdict against the defendant. Id. Whether the error was harmless depends on a number of factors, including the importance of the witness's testimony, whether the testimony was cumulative, the presence or absence of corroborating evidence, and the overall strength of the prosecution's case. Id. (citing Delaware v. Van Arsdall, 475 U.S. 673, 684, 106 S. Ct. 1431, 89 L. Ed. 2d 674 (1986)).

While A.W.'s testimony was significant evidence supporting the assault charge, the error was nonetheless harmless because the interview was cumulative of other admissible evidence, was supported by corroborating evidence, and the State presented overwhelming evidence supporting the assault.

First, the evidence was largely cumulative of statements A.W. made in the 911 call, which was otherwise admissible and uncontested. Among other details, A.W. testified that Kiner struck her repeatedly and described him in detail, including his age, race, build, full name, and birthdate. The only non-cumulative evidence presented in the interview was A.W.'s description of the strangulation. But this evidence could not have prejudiced Kiner where the jury did not find him guilty of assault in the second degree by strangulation and, instead, found him guilty of a lesser included offense.

Second, A.W.'s description of the assault was corroborated by testimony describing her injuries and the signs of assault seen in her apartment. Officer Pitts testified A.W. was injured and bleeding when he arrived, that the bedroom where the assault began was more disheveled that the other bedroom in the home, and that blood spatter was found in the bathroom, where Kiner had followed A.W. to continue the assault.

Third, the State further presented vivid photographs of A.W.'s injuries and the scene.

This otherwise admissible evidence overwhelmingly demonstrated that Kiner assaulted A.W. Thus, any error in admitted A.W.'s hearsay statements was harmless beyond a reasonable doubt.

## C. Recklessness Instruction

Kiner argues the trial court committed instructional error and violated his constitutional right to be present and his right to a public trial when it erroneously instructed the jury on recklessness, which was insufficient to support the crimes charged. Because the error was harmless and does not implicate Kiner's rights to be present at a public trial, we reject this claim.

The State charged Kiner with second degree assault and alleged two means of committing this assault: through strangulation and through reckless infliction of bodily harm. After the State rested its case, it abandoned the reckless infliction alternative and proceeded only on a theory of strangulation. Accordingly, Kiner noted that an instruction defining recklessness was no longer necessary and the court agreed and removed it from the jury instructions.

After deliberations began, however, the court notified the parties that it believed it had inadvertently omitted an instruction on recklessness and informed them that "[c]opies were printed out for the jurors to add to their packet of instructions." Both parties immediately advised the court the instruction was unnecessary and the court quickly provided a remedial instruction informing the jury that it should disregard the instruction, which it had been given in error.

Kiner filed a post-trial motion for a new trial based, in part, on the trial court's erroneous recklessness instruction. The State opposed this motion and informed the court that

> you know, counsel and I did extensively speak with the jury afterwards, and they indicated that had no bearing on their decision.
> Again, I don't think that's substantive evidence of it, but I do think it confirms that because this instruction was provided as an irregularity, it was immediately withdrawn, a limiting instruction was provided, there isn't any prejudice with respect to how the jury would have deliberated in this case and the result that they reached.

The trial court acknowledged that the inadvertent provision of this jury instruction was done in error. But, relying on the jury's indications that it did not consider the instruction, the court denied Kiner's motion.[4]

1. Instructional Error

Kiner first argues that the trial court committed instructional error and impermissibly lowered the State's burden of proof. The State concedes that the

---

[4] Kiner challenges the trial court's reliance on the prosecutor's assurances that the jury reported that it did not rely on the recklessness instruction. Because we review these issues de novo, we need not address this. State v. Momah, 167 Wn.2d 140, 147-48, 217 P.3d 321 (2009), abrogated on other grounds; State v. Irby, 170 Wn.2d 874, 880, 246 P.3d 796 (2011).

court erroneously provided the instruction in error but contends the error was harmless. We agree with the State.

"It is a fundamental precept of criminal law that the prosecution must prove every element of the crime charged beyond a reasonable doubt." State v. Brown, 147 Wn.2d 330, 339, 58 P.3d 889 (2002). A trial court errs by failing to accurately instruct the jury as to each element of a charged crime if an instruction relieves the State of its burden of proving every essential element of the crime beyond a reasonable doubt. State v. Smith, 131 Wn.2d 258, 263, 930 P.2d 917 (1997).

An improper jury instruction may be harmless error so long as the jury is properly instructed on the State's burden. State v. Frost, 160 Wn.2d 765, 780, 161 P.3d 361 (2007). "'An erroneous instruction is harmless if, from the record in [the] case, it appears beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained.'" State v. Carter, 154 Wn.2d 71, 81, 109 P.3d 823 (2005) (alteration in original) (quoting Brown, 147 Wn.2d at 332). Whether instructional error is harmless depends on the facts of a particular case. Brown, 147 Wn.2d at 332.

The trial court erred but there is no reason to believe the error contributed to the verdict. The court first notified the parties that it was providing the recklessness instruction at 9:08 a.m. on April 23, 2021. At 10:34 a.m. the court agreed to withdraw the instruction and gave the jurors a limiting instruction by approximately 11:00 a.m. Thus, the jurors had the erroneous instruction for less

than two hours[5] before the jury was told to disregard it. This brief error occurred a week before the jury rendered its verdict on April 30, 2021. In short, the court promptly corrected its mistake.

Furthermore, the jury had been properly orally instructed as to the level of culpability needed for it to find Kiner guilty of each offense. And the court appropriately defined those levels of culpability. Jurors are presumed to follow the court's instruction. State v. Emery, 174 Wn.2d 741, 766, 278 P.3d 653 (2012). We presume they "read [instructions] as a whole" to discern the "relevant legal standard." State v. Weaver, 198 Wn.2d 459, 467, 496 P.3d 1183 (2021) (alteration in original) (quoting State v. Le Faber, 128 Wn.2d 896, 900, 913 P.2d 369 (1996)). Reading the instructions as a whole, the jury would clearly have understood which levels of culpability were required for it to find Kiner guilty and would have disregarded the mistake.

Under these facts, there is no reasonable possibility that the jury found Kiner guilty based on the less culpable standard of recklessness. The error was harmless.

2.    Rights to be Present

Kiner next argues that the court violated his constitutional right to be present at a critical stage of his trial when it gave the jury the supplemental jury instruction without a hearing. We reject this argument.

---

[5] In its order denying Kiner's motion for a new trial, the court notes that the jury only had the instruction for one hour.

A criminal defendant has a fundamental right to be present at all critical stages of a trial under the confrontation clause of the Sixth Amendment and the due process clause. U.S. CONST. amend. VI, XIV; State v. Irby, 170 Wn.2d 874, 880, 246 P.3d 796 (2011). "[A] defendant has a right to be present at a proceeding 'whenever his presence has a relation, reasonably substantial, to the fullness of his opportunity to defend against the charge.'" Id. at 881 (quoting Snyder v. Massachusetts, 291 U.S. 97, 105-06, 54 S. Ct. 330, 78 L. Ed. 674 (1934), abrogated on other grounds.)

Kiner argues that the court infringed on his ability to defend himself. But while the court undoubtedly violated CrR 6.15, which requires that counsel get a chance to object to the instructions before they are given to the jury, this error was ultimately harmless. And Kiner *was* able to effectively defend himself against the error — as soon as he learned of the court's mistake, he requested that it be withdrawn and the jury be instructed to disregard it. Both of these things were then almost immediately implemented and, as discussed above, the error did not affect the verdict.

    3.    Right to a Public Trial

Kiner similarly asserts that he was denied his right to a public trial when the court provided the supplemental jury instruction. But this right is not implicated here and, therefore, has not been infringed.

The Sixth Amendment and the Washington Constitution guarantee a criminal defendant's right to a public trial. U.S. CONST. amend. VI; WASH. CONST. art. I, § 22; State v. Bone–Club, 128 Wn.2d 254, 261-62, 906 P.2d 325 (1995).

22

"But not every interaction between the court, counsel, and defendants will implicate the right to a public trial, or constitute a closure if closed to the public." State v. Sublett, 176 Wn.2d 58, 71, 292 P.3d 715 (2012).

To determine if the right is implicated, Washington courts apply the "logic and experience" test. Id. at 72. The "experience" prong of this test asks "'whether the place and process have historically been open to the press and general public.'" Id. at 73 (quoting Press-Enter. Co. v. Superior Court of California for Riverside County, 478 U.S. 1, 8, 106 S. Ct. 2735, 92 L. Ed. 2d 1 (1986)). "The logic prong asks 'whether public access plays a significant positive role in the functioning of the particular process in question.'" Id. (quoting Press-Enter., 478 U.S. at 8). If the answer to both questions is yes, the public trial right attaches. Id.

Historically, "proceedings regarding jury instructions in general . . . have not necessarily been conducted in an open courtroom." Sublett, 176 Wn.2d at 75 (finding no "case requiring the discussion of jury instructions to be held in open court"). Kiner presents no authority to the contrary. And Kiner does not explain how public access to the court's ministerial supplementation of the jury instructions — which was done by merely printing the instruction and having it delivered to the jury in the jury room — would "enhanc[e] both the basic fairness of the criminal trial and the appearance of fairness so essential to public confidence in the system." Id. (alteration in original) (quoting Press–Enter. Co. v. Superior Court of California for Riverside County, 464 U.S. 501, 508, 104 S. Ct. 819, 78 L. Ed. 2d 629 (1984)). To the contrary, no witnesses or testimony were involved and there was no interaction for the public to witness. Id. at 77.

Because Kiner cannot satisfy either prong of the experience and logic test, his right to a public trial is not implicated.

## D. Remote Voir Dire

Finally, Kiner argues the trial court violated his right to be present when it conducted jury selection by remote videoconference. We disagree.

As noted above, a criminal defendant has a fundamental right to be present at all critical stages of a trial. Irby, 170 Wn.2d at 880. This due process right to be present extends to jury voir dire. Id. at 883. Whether the defendant's right to be present has been violated is a question of law we review de novo. Id. at 880.

In response to the ongoing COVID-19 pandemic, Washington courts adopted a variety of strategies to ensure that criminal trials could resume in a manner that would protect the health and safety of participants, including jurors. Our Supreme Court issued an order on June 18, 2020, requiring courts to "conduct all [jury trial] proceedings consistent with the most protective applicable public health guidance in their jurisdiction." Ord. re: Modification of Jury Trial Proc., In re Matter of Statewide Response by Washington State Courts to the COVID-19 Public Health Emergency, No. 25700-B-631, at 3 (Wash. June 18, 2020).[6] It explicitly permitted dramatic changes to the usual voir dire procedures, changes that include remote jury selection, stating:

> The use of remote technology in jury selection, including use of video for voir dire in criminal and civil trials, is encouraged to reduce the risk of coronavirus exposure. Any video or telephonic proceedings must be conducted consistent with the constitutional rights of the

---

[6] https://kingcounty.gov/~/media/courts/superior-court/docs/COVID-19/FILED-Emergency-Order27-KCSC-210120503.ashx?la=en [https://perma.cc/X2JE-4YGV]

> parties and preserve constitutional public access. Authorization for video-conference proceedings under CrR 3.4(d)(1) . . . is expanded to include jury selection, though the requirement that all participants be able to simultaneously see, hear and speak to one another does not require that all potential jurors be able to simultaneously see one another.

Ord. re: Modification of Jury Trial Proc. at 3.

King County Superior Court promulgated a similar order. Emergency Ord. #27 re: Criminal Cases, Suspension of In-Person Criminal Jury Trials Through February 12, 2021 (King County Super. Ct., Wash. Jan. 22, 2021).[7] This order noted that "[i]n-person criminal jury trials, with remote voir dire, shall resume on Tuesday, February 16, 2021." Id. at 3.

In accordance with these rules, the trial court decided to conduct jury voir dire by videoconference, with potential jurors participating remotely from their homes. The court explained that, given the COVID-19 risks, it was not willing to bring 200 prospective jurors into the jury room for in-person voir dire and "engage in a super spreader event."

Throughout voir dire, Kiner was present in the courtroom with his attorney. He nonetheless argues that the right to be present at voir dire requires the physical presence of *both* himself and the potential jurors. Kiner presents no authority supporting this argument and instead relies on cases that examine the impact of the use of remote testimony on the defendant's *confrontation* rights.[8] But a

---

[7] https://kingcounty.gov/~/media/courts/superior-court/docs/COVID-19/FILED-Emergency-Order27-KCSC-210120503.ashx?la=en [https://perma.cc/X2JE-4YGV]

[8] Kiner relies largely on State v. Sweidan, 13 Wn. App. 2d 53, 63, 461 P.3d 378 (2020) and State v. Milko, 21 Wn. App. 2d 279, 288, 505 P.3d 1251 (2022).

defendant's right to confront witnesses against him is inherently different from his right to be present during jury voir dire where there are no witnesses. And no court has held that a defendant has a right to confront prospective jurors akin to the right to confront witnesses. Where a party fails to provide citation to support a legal argument, we assume counsel, like the court, has found none. State v. Loos, 14 Wn. App. 2d 748, 758, 473 P.3d 1229 (2020) (citing State v. Arredondo, 188 Wn.2d 244, 262, 394 P.3d 348 (2017)).

Even if we were to agree with Kiner that the case law regarding remote witness testimony is applicable or illustrative here, and conclude that the right to be present for jury voir dire requires in-person testimony absent a finding that remote testimony is necessary to further an important public policy, we nonetheless conclude there was a compelling public need here. The trial court here explicitly stated that it was instituting remote voir dire because of the dire health and safety risks presented by in-person voir dire. The orders promulgated by our Supreme Court and the King County Superior Court demonstrate that this concern was a valid reason to conduct voir dire remotely. And while Kiner is correct in his assertion that no order *required* remote voir dire, the orders certainly authorized it. And it is well settled that trial courts have discretion in determining how best to conduct voir dire. State v. Davis, 141 Wn.2d 798, 825, 10 P.3d 977 (2000). And this court has previously concluded that the trial court's discretion in conducting voir dire extends to its determination of what safety measures are required to mitigate the risks presented by COVID-19. State v. Bell, __ Wn. App. __, 523 P.3d 847 (2023).

Even if this was error, any such error was harmless.  See Irby, 170 Wn.2d at 885 ("A violation of the due process right to be present is subject to harmless error analysis.").  Kiner argues that he was prejudiced because remote voir dire hindered his ability to impress the seriousness of the trial on jurors and his ability to assess juror bias based on nonverbal cues.

But he cites no binding authorities or empirical studies to support his position.  And it is far from clear that the purpose of voir dire is to impress on the jurors the seriousness of the proceeding or develop empathy for either party.  Instead, the purpose of voir dire is "to determine their fitness to serve on the case and to discover and disclose any bias or prejudice for or against either of the parties or any other disqualification."  DOUGLAS J. ENDE, 14A WASHINGTON PRACTICE: CIVIL PROCEDURE § 29:4, at 203 (3d ed. 2018).  Moreover, Kiner makes no argument and points to no evidence in the record that these alleged limitations impacted the selection of the actual jury members who rendered the verdict against him.  Even if we were to assume that in-person communication is preferable in some ways, that does not compel the conclusion that remote jury selection is unconstitutional or prejudiced Kiner in this case.

//

//

//

//

## III.     CONCLUSION

We affirm.

WE CONCUR:

Díaz, J.

Birk, J.

Colen, J.